UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
*Southern Division*

| | |
|---|---|
| **JAMES E. BONNETT** | * |
| **Petitioner** | * |
| v | *   Civil Action No. GJH-21-2478 |
| **NAME UNKNOWN, WARDEN WCI** | * |
| **Respondent** | * |
| | *** |

<u>**MEMORANDUM OPINION**</u>

Respondent asserts, in answer to Petitioner James E. Bonnett's Petition for Writ of Habeas Corpus, that the petition should be denied because it does not raise cognizable claims warranting federal habeas relief and the claims are otherwise unexhausted or meritless. ECF No. 9. Bonnett filed a Reply to the Answer. ECF No. 11. No hearing is necessary. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2021); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)). For the reasons that follow, the Petition is DENIED and a certificate of appealability shall not issue.

**I.     BACKGROUND**

Bonnett was first convicted of the first-degree murder of his wife, Dianna Simpson, and unlawful use of a handgun in 1972, following a jury trial in the Circuit Court for Prince George's County. Bonnett was sentenced to life imprisonment with a consecutive ten-year term. ECF No. 9-1 at 70.[1] Bonnett was granted a new trial in 2014 after an opinion was issued by the Maryland

---

[1] Page numbers correspond to the pagination assigned by the Court's electronic docketing system and may not be the same as those assigned by the party that filed the pleading.

Court of Appeals in *Unger v. State*, 427 Md. 383, 409-10, 48 A.3d 242, 258 (2012) holding that "advisory only" jury instructions violate the Fourteenth Amendment's due process clause. *Id.*

### A. 2014 Trial

Bonnett and Dianna Simpson were married briefly before her June 21, 1972 shooting death. Their marriage was described as tumultuous, culminating in Ms. Simpson seeking separation and a "stay away" order prohibiting Bonnett from coming near her unless she consented. On June 20, 1972, the District of Columbia Superior Court issued the stay away order Ms. Simpson sought but also required the couple to attend marriage counseling sessions.

Minnie Simpson, Dianna's mother, testified at the 2014 re-trial and recalled that she accompanied Dianna to the D.C. Superior Court on June 20, 1972, but did not witness the actual proceedings. ECF No. 9-3 at 37. When Dianna and Bonnett emerged from the courtroom, Minnie Simpson stated that Bonnett was "really agitated" and repeatedly said that "nobody was going to tell him to stay away from his wife" as they walked out of the courthouse. *Id*. at 45. Her attempts to calm Bonnett down were unsuccessful. *Id*.

Mrs. Simpson recalled that On June 21, 1972, she left the house for work around 6:00 a.m. and that when she left her son Rodney,[2] daughters Dianna, Emmojean and Darlene, and Dianna's two-year old daughter Lorena were in the house. ECF No. 9-3 at 48. Additionally, Darlene, who was 12 years-old at the time, was with two friends from the neighborhood who had spent the night at the house. *Id*. Mrs. Simpson testified that Dianna had called her at approximately 7:00 a.m. and, as a result of what Dianna said during the conversation, Mrs. Simpson told her to call the police and to go across the street. *Id*. at 49. Mrs. Simpson received another phone call later that morning from Emmojean Simpson, who told her mother that Bonnett had shot Dianna. *Id*. at 50.

---

[2] Rodney, who was 15 years old at the time, had left the house by the time Bonnett arrived. ECF No. 9-3 at 100.

2

Emmojean Simpson, who was 17 at the time of the shooting, also testified at the 2014 trial. ECF No. 9-3 at 67. At the time of the trial, Emmojean had retired from the Metropolitan Police Department in Washington D.C. after working there for 27 years and achieving the rank of Captain. *Id*. at 60. She recalled that on the evening before Dianna's death, she spoke with Bonnett on the phone when he called the house. *Id*. at 67. Emmojean recalled that she told Bonnett that Dianna was not at home and hung up the phone. *Id*.

On the morning of June 21, 1972, Emmojean awakened to the sound of Bonnett's voice yelling at Dianna, "repeat now what you said in court yesterday in front of all those white people." ECF No. 9-3 at 69. When asked, Emmojean confirmed that she saw and heard Bonnett when he was making these statements. *Id*. at 70. At one point, Emmojean recalled that Bonnett asked Dianna where Lorena, her two-year old daughter, was and Dianna told him it was none of his business. *Id*. at 71. It was at this point that Emmojean got up and went to the doorway where Dianna and Bonnett were because she heard a defensive tone in Dianna's voice. *Id*. When Emmojean got to the doorway she saw Bonnett holding a double-barreled, sawed-off shotgun which he was pointing at Dianna. *Id*. at 72. Emmojean testified that she began begging Bonnett not to shoot Dianna and pleading with Dianna to do whatever Bonnett said to do. *Id*. at 72-73. She recalled that Bonnett was holding the barrel of the gun with his left hand, the stock with his right hand, and had his finger on the trigger. *Id*. at 73. Emmojean described Dianna's demeanor as defeated and tired. *Id*. at 74.

Despite Emmojean's pleas, Bonnett continued yelling and screaming and began stating he was going to kill Dianna before he left. ECF No. 9-3 at 75. Emmojean testified that she witnessed Bonnett grab the collar of Dianna's robe with his left hand, put the gun against her chest and shoot

3

her. *Id*. Bonnett dropped Dianna and ran out of the door. *Id*. at 76. Emmojean never saw Dianna make a move toward Bonnett during the encounter. *Id*. at 78.

The actual gun used by Bonnett was never recovered in 1972 so the State sought to introduce a replica of the gun used. ECF No. 9-3 at 87. Outside the presence of the jury, Emmojean was questioned about the similarities between the replica gun and the gun she saw Bonnett use to shoot Dianna. *Id*. at 89-91. After Emmojean confirmed that the replica gun was substantially the same, with minor differences, the trial court ruled that the replica gun could be introduced into evidence. *Id*. at 96-99. Another witness, Herbert Thomas, who had also seen the gun used in the shooting, confirmed that the replica gun was similar to the gun Bonnett showed him on the day of the shooting. ECF No. 9-4 at 62.

Darlene Simpson, who was 12 years old at the time of her sister Dianna's death, testified in the 2014 trial. ECF No. 9-3 at 140-179. Darlene recalled that in the week before the shooting, she had spoken with Bonnett on the phone three or four times when he called and asked if Dianna was there. *Id*. at 149. When Darlene would say Dianna was not there, Bonnett would tell Darlene not to lie and Darlene would hang up. *Id*. Bonnett would then call again saying things to Darlene like "you don't want your sister to die, do you? If I see her or she come out [sic] I'm going to kill her." *Id*. Darlene testified that at one point, Bonnett called and told Darlene he would not kill her sister if Darlene retrieved a ring Bonnett had given Dianna and brought it to him. *Id*. at 150. Darlene recalled getting the ring from Dianna and walking with a friend down the street to give it to Bonnett a couple of days before the shooting. *Id*. at 151. Despite her efforts, Darlene testified that Bonnett called again on June 20, 1972, threatening to kill Dianna. *Id*. at 152.

Rose Lindsey was a neighbor of the Simpsons in 1972; her daughters Connie and Roberta were spending the night with Darlene Simpson the night before Dianna's death. ECF No. 9-3 at

4

181.  Ms. Lindsey testified that she overheard Bonnett telling another man while standing outside of the corner store that "if I can't have her, nobody going to have her and I'll kill her." *Id*. at 182. During her testimony, it was established that Ms. Lindsey did not testify or provide a statement to police in 1972; rather, the first time she told anyone about the conversation she overheard was one week before the 2014 trial when the State's Attorney called her. *Id*. at 183-86 (cross-examination). Defense counsel argued that the State had opened the door to enable him to tell the jury that this case went to trial once before. *Id*. at 188-89.  Because the State's Attorney and defense counsel had entered a stipulation that the 1972 trial would not be mentioned and would only be referred to as a prior proceeding, the trial court rejected counsel's argument and prohibited any reference to the 1972 trial and conviction.  *Id*.

      Detective Bernard Nelson of the Prince George's County Police Cold Case Unit testified for the State to explain that he had done a search for the evidence used at the 1972 trial but could only locate the autopsy report and pictures of the deceased.  ECF No. 9-3 at 197.  No physical evidence, including Bonnett's clothing he wore on the day of the shooting, was recovered.  *Id*. Detective Nelson explained that prior to 2006, the evidence retention policy for homicide cases in effect for the Prince George's County Police was twenty-five years.  *Id*. at 194.  In 2006, the policy was changed to a seventy-five-year retention policy.  *Id*.

      Herbert Thomas, who was married to Bonnett's cousin and living in a house with Bonnett's uncle, testified that on June 21, 1972, Bonnett came to the house at approximately 9:00 a.m. and woke Thomas and his wife.  ECF No. 9-4 at 58.  Thomas recalled that Bonnett had a brown box in his hand which he put under a sofa in the basement where Thomas and his wife were sleeping. *Id*.  At approximately 11:00 a.m., Thomas testified that Bonnett returned, retrieved the box, and showed Thomas the sawed-off shotgun that was in the box.  *Id*.  According to Thomas, Bonnett

took the gun out of the box, stepped back from him about five to seven feet, and pointed the gun at Thomas and his wife. *Id*. at 59. At that time, Bonnett asked Thomas what would happen if he shot someone from that distance. *Id*. After Thomas told Bonnett that "you would blow them away," he recalls Bonnett stating that the gun was "a bad motherfucker." *Id*. at 60. Thomas described Bonnett's demeanor as calm during their interactions and he had no apparent injuries to his face. *Id*. at 63. Later that night, at approximately 9:30 p.m., Bonnett returned to the house and told his uncle that he wanted to turn himself in; Bonnett was arrested at the house. *Id*. at 64-65. Thomas confirmed, during cross-examination, that Bonnett did not have blood on his clothes when he saw him on the day of the shooting. *Id*. at 65.

The defense's case consisted of Bonnett's claim that the shooting was an accident rather than an intentional act. Bonnett testified at the trial in 1972 and in 2014. ECF No. 9-5 at 28-193. Bonnett testified that he went to Dianna's house on the morning of June 21st to talk to her and he brought the sawed-off shotgun because he was afraid Dianna's father would shoot him if he found out Bonnett was there. *Id*. at 68-69. He explained that:

> I went over there because that was my wife. I was – I don't know, I didn't have no control over a disposition of law and order. I didn't have any control because I wanted – Dianne was like a good meal. You just eat it, eat it, eat it, right? She was a good meal. I loved her very much. It seemed like I wouldn't be settled down unless I got my wife back. It takes two to tango. I said to myself we can work it out. You're wrong, too. You're just as wrong as I am, you know. That is the way it came.

ECF 9-5 at 70. He denied pointing the gun at Dianna and claimed that when Emmojean abruptly entered the room, he pulled the gun out of his pants, "there was an episode of pushing and shoving" and the "gun went off.". *Id*. at 78; 156.

The State used Bonnett's testimony from the 1972 trial to impeach his 2014 testimony. Bonnett admitted that he told Darlene, Dianna's 12-year-old sister, that he was "going to hurt her

6

[Dianna] bad" and allowed that it was possible that he had said he was going to kill Dianna. ECF No. 9-5 at 97-98. Bonnett also admitted that he told Darlene to retrieve a pre-engagement ring from Dianna and to bring it to him. *Id*. at 99.

The jury deliberated for approximately three days before returning a verdict of guilty on both the charge of first-degree murder and unlawful use of a handgun. ECF No. 9-6 through ECF No. 9-8. On February 13, 2015, after hearing testimony from Dianna Simpson's family members, as well as mitigation witnesses presented by the defense, Bonnett was again sentenced to serve life and a consecutive ten-year sentence. ECF No. 9-9.

### B.     Direct Appeal

Bonnett appealed the 2014 conviction to the Maryland Court of Special Appeals and raised the following grounds:

> 1.     Was Mr. Bonnett's sixth amendment right to effectively cross examine a critical State witness improperly infringed upon when the Circuit Court refused to permit the witness to be questioned about Mr. Bonnett's first trial in 1972?
>
> 2.     Did the Circuit Court abuse its discretion in failing to grant a mistrial as a result of the State's failure to produce exculpatory physical evidence from the 1972 investigation at the new trial in 2014?
>
> 3.     Did the Circuit Court abuse its discretion in failing to allow testimony about Mr. Bonnett's 42 years of incarceration and in turn err in denying a motion for mistrial based on the same grounds?

ECF No. 9-1 at 37-38 (Appellant's Brief).

In an unreported opinion filed on June 10, 2016, the Court of Special Appeals affirmed Bonnett's convictions.[3] ECF No. 9-1 at 120-136. The mandate issued on July 11, 2016. *Id*. at 137. Bonnett filed a petition for writ of certiorari with the Maryland Court of Appeals on August 4, 2016. *Id*. at 139-43, *see also id.* at 138 (receipt of filing). On September 29, 2016, the Court of

---

[3]     Content from the appellate court's decision is discussed as appropriate below.

Appeals denied the petition because it was not timely filed. *Id*. at 144. Bonnett did not seek review in the United States Supreme Court.

### C.       Post-Conviction

On October 17, 2016, Bonnet filed a self-represented petition for post-conviction relief. ECF No. 9-1 at 145-51. Three supplemental petitions, the second of which was counseled, were filed on February 1, October 31, and November 22, 2019. *Id*. at 152-79. A hearing was held on October 13, 2020; Bonnett was represented by counsel and trial counsel, Douglas Irminger, was called as a witness. ECF No. 9-10 at 1-91. Post-conviction relief was denied by the court[4] in a ruling from the bench which was incorporated into a later issued order. *Id*. at 92-105; ECF No. 9-1 at 198 (Oct. 20, 2020 Order). Bonnett filed an application for leave to appeal the denial of post-conviction relief with the Court of Special Appeals on November 30, 2020. ECF No. 9-1 at 199-279. The application was denied in an unreported opinion filed on March 30, 2021. *Id*. at 280-81. The mandate issued on April 29, 2021. *Id*. at 282.

Bonnett filed a motion to re-open post-conviction proceedings with the Prince George's County Circuit Court on August 12, 2021. ECF No. 9-1 at 283-88. The motion was denied on November 23, 2021. *Id*. at 289-91.

### D.       Petition for Writ of Habeas Corpus

In his petition filed with this Court Bonnet raises four grounds.

> 1.      The State's chief witness committed perjury in both the 1972 and 2014 trials. Bonnett told the State's Attorney that he had had a relationship with the witness and she assisted his escape from jail by smuggling a pistol into the jail in 1972.

> 2.      The post-conviction judge refused to consider the credibility of the State's witness. The State's attorney withheld information from the jury that was in the discovery file.

---

[4] The content of both the post-conviction petitions and the decision denying relief are discussed in greater detail below as appropriate.

3. The post-conviction judge refused to consider the facts and stated the information [withheld by the State] was only an effort to relitigate the trial and the stated perjury ground was not a proper basis for post-conviction relief.

4. There was a conflict of interest for Bonnett's attorney.

ECF No. 1 at 5.

## II.     STANDARD OF REVIEW

### A.     Federal Habeas Corpus Standard

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* 572 U.S.415, 419-20 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2)

9

"confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Pursuant to the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id*. "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett,* 559 U.S 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have

"resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379.

### B.     Ineffective Assistance of Counsel Standard

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires the Court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id*. at 696.

As the Supreme Court held in *Strickland v. Washington*, *supra*, "a state court conclusion that counsel rendered effective assistance of counsel is not a finding of fact binding on the federal court to the extent stated by [former] 28 U.S.C. § 2254(d)[ now § 2254(e)(1)]." *Id*. at 698. Rather, "although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254[(e)(1)], . . . both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id*. It follows, then, that § 2254(d)(1) applies to the state court's conclusion that the petitioner's trial counsel rendered effective assistance of counsel and this Court may not grant relief on this claim as long as the state court denied the claim based on a reasonable application of the *Strickland* standard to the facts presented in the state court proceeding.

### C. Exhaustion of Claims

When filing a federal habeas corpus application under 28 U.S.C. § 2254, a petitioner must show that all of his claims have been presented to the state courts. 28 U.S.C. § 2254(b) and (c); *see also Preiser v. Rodriguez*, 411 U.S. 475, 491 (1973), *Mallory v. Smith*, 27 F.3d 991, 994 (4th Cir. 1994) (petitioner bears the burden of demonstrating state remedies have been exhausted). This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider it. For a person convicted of a criminal offense in Maryland this may be accomplished either on direct appeal or in post-conviction proceedings.

To exhaust a claim on direct appeal in non-capital cases, it must be raised in an appeal, if one is permitted, to the Maryland Court of Special Appeals and then to the Maryland Court of Appeals by way of a petition for writ of certiorari. *See* Md. Code Ann., Cts. & Jud. Proc. § 12-201 and § 12-301.

If an appeal of right is not permitted, exhaustion can be accomplished by filing an application for leave to appeal to the Court of Special Appeals. Md. Code Ann., Cts. & Jud. Proc. § 12-302(e). If the Court of Special Appeals denies the application, there is no further review available and the claim is exhausted. Md. Code Ann., Cts. & Jud. Proc. § 12-202. However, if the application is granted but relief on the merits of the claim is denied, the petitioner must file a petition for writ of certiorari to the Court of Appeals. *Williams v. State*, 292 Md. 201, 210-11 (1981).

## II. ANALYSIS

Preliminarily, Bonnett's attempts to have this Court review the proceedings that took place in 1972 are without any legal basis. ECF No. 11 at 3. The 1972 conviction was overturned and Bonnett received a new trial, making any error that occurred in 1972 a legal nullity. *See* ECF No.

9-10 at 93 (post-conviction decision, 1972 trial "is of no matter because that was vacated following the *Unger* decision."). Bonnett's request that this Court obtain transcripts or other documents generated by the 1972 trial is denied.

### A.     Claim One

In his first claim, Bonnett asserts that Emmojean Simpson committed perjury during her testimony and, seemingly, attempts to bolster this claim with an allegation that he was having a sexual relationship with Emmojean at the time of Dianna's death. He further claims that Emmojean smuggled a gun into the jail where he was held in 1972, thereby assisting his escape. ECF No. 1 at 5. Bonnett raised a similar claim in his post-conviction proceedings and the court rejected the claim, calling it "an effort to relitigate her credibility" which had been determined by the jury. ECF No. 9-10 at 93. The post-conviction court also observed:

> First of all, I don't find that that has been established as a matter of fact. I, frankly, do not believe Mr. Bonnett's testimony that that occurred. Second, even if it did, issues about the State not disclosing back to the defense that they had received a letter from the defendant is it's circular, and that certainly can't be the basis of any claim of lack of discovery to tell him back what he told them. And I don't find that there's any merit to the claim, so the motion would be denied on that ground.

ECF No. 9-10 at 100.

To the extent that Bonnett implies an ineffective assistance of counsel claim because his trial attorney failed to present this salacious allegation at trial, the claim fails. Bonnett admits that his attorney advised against bringing this matter out during trial given that Emmojean was 17 years old at the time of her sister's death and it involved his admission that he committed a serious crime. In a letter to Bonnett from post-conviction counsel, which he included with his application for leave to appeal, counsel explained why such evidence would not have helped him at trial:

> There was no testimony or evidence presented at either trial of a relationship between you and [Emmojean] Simpson. You testified and you could have told

> the jury about this relationship, but that would have opened the door to the jury hearing about your escape charges and possibly about having a gun in the jail. That testimony would not have been helpful. It also would not have been helpful for the jury to hear you were having sex with your wife's teenage sister. Your defense was that you loved Dianna and had no intention to shoot her. If it came out that you were in love with Emmojean, you would have a motive to kill your wife. If the jury learned you and Emmojean were having sex, it would have completely undermined your case.

ECF No. 9-1 at 235 (letter dated Oct. 25, 2019). With regard to Bonnett's claim that Emmojean smuggled a gun into the jail, post-conviction counsel advised this would not be presented at the post-conviction proceeding for the following reasons:

> I understand that could have been her motivation for testifying falsely at trial but there was no other evidence presented that Emmojean – or anyone else – shot your wife. You confessed to it. Ms. Simpson testified at both trial as to what happened. Even if you were having a relationship with her and even if you paid her $3500 to help you escape it had little bearing on her testimony as to what happened when you came to her house and shot Dianna.
>
> As you know, post conviction is not about retrying the case. It concerns, for the most part, legal issues that should have been raised at trial or on appeal. Therefore, I will not call Emmojean Simpson or other witnesses. Their testimony was what it was; all were cross-examined. I reviewed Emmojean's testimony in 1972. It was essentially the same as it was in 2014, and Mr. Irminger, trial counsel, cross-examined her on any discrepancies.

*Id*. at 236.

Bonnett's claim that this evidence should have been presented to the jury does not include any rational explanation as to how the absence of this evidence harmed him. "[T]he standard for determining whether habeas relief must be granted is whether the . . . error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, (1946)). Moreover, "'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Elmore v. Ozmint*, 661 F.3d 783,

857 (4th Cir. 2011) (quoting *Strickland*, 466 U.S. at 688). For these reasons, habeas relief is denied on this asserted ground.

### B.     Claims Two and Three

Bonnett assigns error to the post-conviction court's refusal to consider the credibility of the State's witness and the asserted failure by the State's Attorney to disclose information from the jury that was in the discovery file. ECF No. 1 at 5. Bonnett also claims that the post-conviction judge refused to consider the facts when it rejected his claim regarding the State withholding evidence as an effort to relitigate the trial and holding that the perjury claim was not a proper basis for post-conviction relief. *Id*.

Bonnett raised similar claims in his Motion to Reopen Post-Conviction proceedings. ECF No. 9-1 at 283-88. Specifically, Bonnett argued that the proceedings should be reopened in the interests of justice because: the post-conviction judge made remarks that indicated he was relying on his personal opinion which Bonnett argued was not credible; and the State's chief witness committed perjury which was orchestrated by the State's attorney. *Id*. Bonnett's Motion to Reopen was denied. *Id*. at 289-91. However, Bonnett did not appeal the denial of his motion to the Maryland Court of Special Appeals and the Court of Appeals. That failure means that these two claims have not been properly exhausted and are subject to dismissal on that basis alone. However, even if these claims had been exhausted, they are meritless.

In denying Bonnett's Motion to Reopen, the court reviewed the transcripts of the hearing and found that the quote by Judge Wallace relied upon by Bonnett to demonstrate personal preference or opinion, actually demonstrated that the judge "listened to [Bonnett's] claims and found that they were not meritorious." ECF No. 9-1 at 290. With regard to the asserted perjury, the court agreed with Judge Wallace's analysis that it was not a proper ground for post-conviction

15

relief. *Id*. Bonnett's bald allegations that there was information missing from the discovery file and that Emmojean Simpson committed perjury are not supported by any evidence that he has provided the State courts or this Court. Thus, these two claims, even if they were exhausted, lack any merit and do not warrant federal habeas relief.

**C.     Claim Four**

A conflict of interest for Bonnett's trial counsel required new counsel to represent Bonnett at the sentencing proceeding. ECF No. 1 at 5. Bonnett's trial counsel, Douglas Irminger, represented him throughout the merits trial but withdrew his appearance before the sentencing hearing took place due to a conflict of interest. ECF No. 9-10 at 39-40. A panel attorney, Mark Brooks, was appointed to represent Bonnett at sentencing. *Id*. at 40. During Bonnett's testimony at the post-conviction trial, he stated that Mr. Brooks "was a very diligent attorney" but that he did not receive all the information Mr. Irminger had. *Id*. at 41.

Mr. Irminger also testified at the post-conviction hearing and specifically recalled the circumstances that prompted him to withdraw from the case. He testified that the week that Bonnett's sentencing hearing took place, he received an email with "a little over a hundred pages of new discovery[5] attached" that contained a Division of Correction record stating that Bonnett had threatened "a fellow inmate by the name of Carlos Mayberry." ECF No. 9-10 at 61. Mr. Irminger was representing Mayberry in an ongoing case, and because representation of Bonnett "might've . . . required [him] to go into that allegation" he immediately consulted the Deputy Public Defender about the possible conflict of interest. *Id*. at 63. Because both Irminger and the Deputy Public Defendant agreed that a "very serious conflict of interest" had arisen, Irminger withdrew his appearance and a panel attorney was assigned. *Id*., *see also id.* at 93-94.

---

[5]     The referenced discovery specifically pertained to sentencing considerations. ECF No. 9-10 at 78-79.

In rejecting any claim that Brooks was not prepared for the sentencing proceeding, the post-conviction court noted that there was "no evidence that that factually occurred." ECF No. 9-10 at 98. The court noted that any suggestion that this was a "last minute switch" is unsupported by the record. *Id*. The case was continued once to allow Brooks time to prepare, and the sentencing proceeding took place three months after Brooks entered an appearance and four months after the hearing was originally scheduled. *Id*. at 99.

To state a claim of ineffective assistance of counsel due to a conflict of interest, evidence of active representation with actual conflicting interests together with evidence that the conflict of interest adversely affected the attorney's performance is required. *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980); *Nix v. Whiteside*, 475 U.S. 157, 165 (1986). Here, Bonnett has produced evidence of neither prong. Irminger sought to withdraw his representation as soon as the conflict of interest became apparent to him and therefore did not represent Bonnett after the conflict arose. Further, the post-conviction court's finding that Brooks's representation of Bonnett at the sentencing proceeding was not deficient is not a misapplication of Supreme Court precedent and is not based on a clearly erroneous finding of fact. Habeas relief is denied on this claim.

IV.     **CONCLUSION**

Having found that the Petition for Writ of Habeas Corpus does not present a claim upon which federal habeas relief may be awarded, this Court must consider whether a certificate of appealability should issue. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, 137 S.Ct. 759, 773 (2017). The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the

issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability shall be denied. *See* 28 U.S.C. § 2253(c)(2). Bonnett may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

By separate Order which follows, the Petition for Writ of Habeas Corpus shall be denied and dismissed and a certificate of appealability shall not issue.


5/23/2022_____  \_\_\_/s/_____
Date   GEORGE J. HAZEL
       United States District Judge